No. 36,454

JACK KELLY, *Appellee*, v. W. R. GRIMSHAW, doing business as W. R. GRIMSHAW CONSTRUCTION COMPANY, *Appellant*.

(167 P. 2d 627)

Opinion filed April 6, 1946.

*J. B. Patterson*, of Wichita, and *M. C. Rodolph*, of Tulsa, Okla., argued the cause, *A. W. Hershberger, Enos E. Hook, R. E. Kirkpatrick* and *Richard Jones*, all of Wichita, were on the briefs, for the appellant.

*Earl C. Moore*, of Wichita, argued the cause, and *Lester Wilkinson* of Wichita, was on the briefs, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The principal question involved in this case is whether the state court had jurisdiction to consider a petition of a workman praying for additional wages based upon a claim for an alleged classification under a contract entered into between the workman's employer and the United States of America acting through the Federal Public Housing Commissioner. The district court, in substance, determined the workman's classification and accordingly entered judgment for him. Appeal to this court followed.

The case was tried upon an amended petition filed by the workman, Kelly, which alleged: That Kelly was hired by the defendant,

Grimshaw, for seventy-nine weeks at a salary of $25 a week; that Grimshaw entered into a contract with the United States government which required, among other things, that Grimshaw pay a mimimum of sixty-five cents for each hour of work performed by unskilled laborers in each forty-hour week, and in addition pay to such unskilled laborers wages figured upon time and a half for all hours over forty in which such laborers were employed during each week; that Kelly performed the duties of an unskilled laborer and was required to go on duty at 6:00 p. m., and remain on duty, without time off, until 6:00 a. m., seven days each week, and that computing the difference between the amount actually paid Kelly and the amount due him as an unskilled laborer resulted in his being entitled to recover additional wages in the amount of $2,317.59, together with interest thereon at the rate of six percent from June 1, 1943, which was the termination date of his employment.

For some reason the answer of Grimshaw does not appear in the abstract, counter abstract or supplemental abstract but its absence is not fatal to decision in this case since the introduction of the entire contract referred to in Kelly's amended petition raises the issue with which this court primarily is concerned.

The record discloses that a jury was called for the sole purpose of answering a special question—whether Kelly was working as an unskilled laborer or as a watchman. The jury was unable to agree upon an answer to the question and was discharged. Thereafter the case was submitted to the court upon the evidence introduced before the jury and the court found in favor of the plaintiff. A motion for a new trial was filed and allowed and the case again was submitted to the court upon the record of the evidence introduced in the trial before the jury. The court again found in favor of the plaintiff and overruled a second motion for a new trial.

Further examination of the record reveals that counsel for Kelly contended that the action was brought on the theory that the contract entered into between Grimshaw and the government was a third-party beneficiary contract and that the action was brought in behalf of Kelly as such a third-party beneficiary but that it was not brought under any of the federal acts. We quote from the record:

"If the court please, it is our theory of the case that this is a third party beneficiary contract strictly and that it is not under any of the Federal Acts exactly. The petition does state that the said contract specifications required

the defendant to pay the minimum of 65 cents per hour and time and a half for overtime. That is an allegation about the contract. This is purely a third party beneficiary suit as we see it under the Kansas decisions."

According to Kelly's counter abstract, his counsel further stated:

". . . that the contract of Defendant with the Government contained a stipulation for a minimum wage of 65 cents per hour for unskilled labor. That Plaintiff was employed and worked at unskilled labor. That he was suing for what he should have received according to the contract."

From the foregoing it conclusively appears that Kelly was attempting to recover the amount he should have received under and by reason of the provisions of the contract entered into between Grimshaw and the government—not an amount he was entitled to recover under any agreement made between himself and Grimshaw.

In support of the amended petition Kelly introduced at least seven portions or provisions of the contract between the government and Grimshaw. Such portions so introduced pertained to the eight-hour law, rates of wages, overtime compensation, specifications or classifications of labor, and other matters.

Kelly also introduced testimony to the effect that although he was employed as a watchman he actually did work as a common or unskilled laborer; that he was paid only as a watchman at various rates ranging from $25 to $50 a week. On cross-examination he admitted that he had been paid all that the company had agreed to pay him; that he knew that unskilled labor was receiving more wages than he did on the job and that he was physically able to do unskilled labor if he had wanted to. His testimony consisted principally of showing that the work which he had done entitled him to the classification of an "unskilled laborer" and that he had always worked twelve hours a day instead of eight. A witness testified, as an expert, that the work which Kelly had done should have been classified as "common" or "unskilled" labor. Thus it appears that Kelly was attempting to have the jury and later the court fix his classification as that of an "unskilled laborer" as distinguished from a "watchman." The defendant introduced the entire contract in evidence and thereafter filed a demurrer to the evidence. We are not particularly concerned with the grounds of the demurrer although it did raise the question whether Kelly had any right to recover any amount in the district court. If such a tribunal had no jurisdiction of the subject matter in controversy then the proceedings in such court could not aid Kelly.

Unquestionably Kelly was relying upon the government contract regardless of whether he was bringing the action exactly under any federal acts referred to therein. His counsel not only introduced seven provisions of the contract but in this court, at least, they further contend that the contract required Grimshaw to pay the specified wage rate set forth in the contract "regardless of any contractual relationship existing between the contractor and the laborer." Therefore, Kelly was not only relying upon the contract between Grimshaw and the government for the purpose of establishing the amount he was entitled to recover but also was relying upon the provisions of the contract to abrogate any agreement entered into between himself and Grimshaw relative to the rate of his wages. Without reference to the government contract Kelly had no basis whatever for recovery because of his admission that Grimshaw had paid him the full amount of wages which he had agreed to accept.

1. What is the result? We do not pass upon the question whether the involved contract was a contract for the benefit of a class of third parties, of which Kelly was a member. If we assume that the contract inured in part to the benefit of Kelly as a third party, nevertheless, a litigant who relies upon a third-party contract which he claims was made for his benefit cannot pick from its provisions certain parts which are favorable to him and disregard other pertinent parts which are in the nature of restrictions and limitations upon his possible rights unless it clearly appears that it was the intention of the parties that the contract should be severable. Such an intention does not clearly appear and consequently see 17 C. J. S. 786, § 331 et seq., from which the following is quoted:

"Ordinarily when one party contracts to do certain work or to perform certain services, and the other to pay a certain price for the same, the contract is to be regarded as entire, . . ."

12 Am. Jur. 873, § 318, sets forth the rule as follows:

"It seems clear that where one party contracts to do certain work or furnish certain property and the other to pay a certain price for the same the contract is entire."

As was said in Utilities Co. v. Bowersock, 109 Kan. 718, 727, 202 Pac. 92:

"It is hardly necessary to refer to authorities that the contract must be construed as a whole. (Citing Howerton v. Gas Co., 81 Kan. 553, 106 Pac. 46.)"

See, also, 17 C. J. S. 707, § 297.

The rule is the same as to third-party beneficiaries. 12 Am. Jur. 842, § 289, reads as follows:

"It has been said that before the beneficiary may accept the benefits of the contract, he must accept all of its implied, as well as express, obligations. It has been said that if the beneficiary accepts, he adopts the bad as well as the good, the burden as well as the benefit."

2. When Kelly introduced part of the contract and Grimshaw introduced all of it, it became necessary for the trial court to construe the contract in its entirety. The first duty of that court was to determine whether the court had jurisdiction of the subject matter. See *National Bank of Topeka v. Mitchell*, 154 Kan. 276, 118 P. 2d 519, from which the following is quoted:

"Where there is entire lack of jurisdiction the question may be raised at any time—even for the first time on appeal. If such lack appears to the court at any time it is of course the duty of the court to recognize it, even though no objection be raised. (14 Am. Jur. 385 § 191; 21 C. J. S. 173, §§ 112, 175, 114.)" (p. 279.)

Obviously the gravamen of the subject matter was whether Kelly should have been classified as an "unskilled laborer." Kelly's rights to recover were dependent upon such a classification. An examination of the provisions of the voluminous contract is required in order to determine whether it contains any provisions pertaining to the classification of workmen and the consequent payment of wages in proper amounts. Such an examination reveals that article 17 of the contract pertains to "Rate of Wages." and provides that the act of August 30, 1935, 49 Stat. 1011, as amended by the act of June 15, 1940, 54 Stat. 399 (U. S. Code, 1934 ed., Title 40, secs. 276a and 276a-1) shall apply. Subsection (*a*) under said article provides that the contractor shall pay all mechanics' and laborers' wage rates not less than those stated in the specifications, regardless of any contractural relationship which may be alleged to exist between the contractor and such laborers and that the scale of wages to be paid shall be posted by the contractor in a prominent and easily accessible place at the site of the work. It also provides that the contracting officer shall have the right to withhold so much of the payments as may be considered necessary by the contracting officer to pay laborers and mechanics employed by the contractor the difference between the rates of wages required by the contractor to be paid laborers and the rates of wages received by such laborers and not refunded to the contractor.

Subsection (*b*) of such article provides that in the event it is found by the contracting officer that any laborer is being paid a rate of wages less than the rate of wages required by the contract to

be paid, the government may, by written notice to the contractor, terminate his right to proceed with the work, or such part thereof as to which there has been a failure to pay required wages, and in such event the government may prosecute the work to completion by contract or otherwise and hold the contractor and his sureties liable to the government for any excess costs occasioned the government thereby.

We note in passing that under the General Condition of the contract it is provided in section 18, subsection (c) as follows:

"The contractor shall provide sufficient competent *watchmen*, both day and night, including Saturdays, Sundays, and holidays from the time work is commenced until final completion and acceptance." (Emphasis supplied.)

We note further in passing that article 26, subsection (b) of the general conditions provides as follows:

"No person whose age or physical condition is such as to make his employment dangerous to his health or safety or to the health and safety of others shall be employed in the development of the Project: *Provided,* that this shall not operate against the employment of physically handicapped persons, otherwise employable, where such persons may be safely assigned to work which they can ably perform."

Article 27 under the general conditions of the contract reads as follows:·

"a. There shall be paid each mechanic or laborer of the Contractor . . . engaged in work on the Project under the Contract in the trade or occupation listed below, not less than the hourly wage rate set opposite the same, . . ."

In the contract before us the applicable classifications and hourly rates were not set forth in the space thereafter allotted therefor. However, a list showing the classifications and the hourly rates was attached as part of Addendum No. 1 to the general conditions of the contract. The addendum reads as follows:

"The following minimum rates have been authorized by the Secretary of Labor, under the Davis-Bacon Act, in a decision dated March 24, 1942, for the proposed demountable housing project in Wichita, Sedgwick County, Kansas."

and following such statement there are listed eighty-three different classifications of laborers. Opposite each classification the minimum rate is designated. The list does not include a classification for "watchmen." It does include a classification for "Laborers, unskilled" and the rate for such is fixed at ".65." It may be noted also that the classification does not cover the rate of pay for time-

keepers, clerks, stenographers, bookkeepers, accountants, auditors, superintendents, and many other types of employees usually required in connection with the completion of a housing project involving an expenditure of over two million dollars. In fact, the classification list covers principally skilled artisans or tradesmen and their assistants in connection with whose work it was necessary to perform manual labor. Apparently the government made no attempt to classify other types of employees or to fix the rate at which they should be paid. Possibly the government was content to allow supply and demand and open competition to determine the amount which should be paid to such employees. The contract did contemplate, however, that such employees, including watchmen, were necessary as shown by subsection (c) of article 18 hereinbefore set forth. The same also appears by reason of the fact that under article 36 of the contract, which pertains to changes in work, a cost allowance for overhead and profit is considered and it is provided therein that "among the items considered as overhead are included . . . superintendent, timekeeper, clerks, *watchmen*, use of small tools, incidental job burdens, and general office expenses." (Emphasis supplied.)

3. The contract does not provide for a minimum wage which should be paid to any employee regardless of his or her classification or lack of classification. Of course, it would have been possible to have employed watchmen who were not physically qualified to perform regular manual labor and who were therefore not entitled to receive the minimum wages provided for unskilled laborers. A man with one arm or a wooden leg might have been fully qualified to act as a watchman and still have been unable to perform the usual duties of an unskilled laborer. Nevertheless, if a contractor actually required a man employed as an unclassified watchman to perform the work of an unskilled laborer, a question might arise as to whether such a man should be properly classified and paid as contemplated by the contract. The question, therefore, arises—did the contract have any provision relative to proper classification in the event of such a development? Reference to subsection (b) of article 27 of the general conditions of the contract clearly discloses that it did. Subsection (b) reads as follows:

"Any laborer or mechanic employed to perform work not covered by any of the foregoing classifications shall be paid not less than the minimum rate of wages specified herein for the classification which most nearly corresponds

to the work to be performed by him, and such minimum wage rate shall be retroactive to the time of initial employment of such person in such classification. *In the event any dispute on that question cannot be adjusted by the Contracting Officer, the question and the information, together with the Contracting Officer's recommendations thereon, shall be referred for determination to the Secretary of Labor whose decision on the question shall be conclusive* on the parties to the Contract with the same effect as if the work performed by such laborer or mechanic had 'been classified and the minimum rate specified herein." (Emphasis supplied.)

The present case is a clear instance of an employee not covered by any of the contract classifications desiring to have a classification fixed for him in connection with the determination of which a dispute arose. Therefore, the provision in the contract last quoted was applicable and controlling. The question which follows is whether the courts have construed such a provision as vesting in the contracting officer and the Secretary of Labor the sole right to adjust such disputes. In considering a similar provision under the Heard Act, 40 U. S. C. A., § 270, the federal district court in *United States v. Murphy*, 11 F. Supp. 572, held as follows:

"Careful consideration of the section quoted is convincing that in event of dispute Congress intended to place the determination of such issues exclusively with the Secretary of Labor, and that his decision thereon should be conclusive. It seems clear that Congress did not contemplate that laborers and mechanics employed on public buildings may accept compensation at something less than the alleged prevailing wage and thereafter proceed under the Heard Act (40 USCA, § 270) upon the contractor's bond in a court of law to recover additional compensation upon the theory that they were entitled to a different classification as to the character of the labor performed, and therefore to a higher rate of wages. Use plaintiff does not claim that any dispute arose during the performance of the contract or that any effort to adjust the dispute was ever made with the contracting officer.

"Because of the view of the court that the enforcement of the prevailing wage agreement in the contract was intended to be solely in the hands of the Department of Labor and that issues arising thereunder may not be presented in proceedings under the Heard Act, an order will be entered granting the motion to dismiss." (p. 573.)

It is noted that the Heard Act, to which reference is made in the above opinion, merely requires the contractor to furnish a bond to secure the payment of labor and material bills. Another case dealing with the same question is that of *Kutsche & Co. v. Keith*, 169 Tenn. 399, 88 S. W. 2d 454. In the cited case a carpenter's helper brought an action against the contractor constructing a post office for the difference between wages paid and the prevailing rate of

wages paid to carpenters for similar work, and contended that he was entitled to the rate paid to carpenters because he had performed the regular duties of a carpenter. From the decision the following is quoted:

"It is apparent that before any particular schedule of wages can be held applicable, it is necessary to determine the classification under which the work performed actually falls. Under the act in question, the Secretary of Labor is to determine the rates of wages for 'work of a similar nature.' Whether or not the work performed by defendants in error was of a similar nature to that of carpenter presents a dispute which alone can be determined by the Secretary of Labor.

"In order to recover at all, defendants in error must rely on the contract between plaintiff in error and the government of the United States, since they were paid all that was due them under their contract with plaintiff in error. The rule is that when a right is given by statute, and a remedy is prescribed, that remedy must be pursued. *Nashville & Chattanooga Railroad Co. v. Sprayberry,* 9 Heisk. (56 Tenn.) 852; *Flatley v. Memphis & Charleston Railroad Co.,* 9 Heisk. (56 Tenn.) 230. It is argued for defendants in error that they do not have to rely on the contract of plaintiff in error with the United States in order to secure a recovery; but may seek and secure relief solely on the basis of said statute. Nevertheless, if relief is sought on the basis of that law, it would have to be sought in accordance, and in the forum, fixed by statute. *A. W. Kutsche & Co. v. Anderson,* (Tenn. Sup.) 83 S. W. (2d) 243.

"The determination by the Secretary of Labor of the question of the rate of wage for work of a similar nature to that performed by the complaining servant is made conclusive by the act on all parties to the contract. Furthermore, . . . it is provided that if it shall be found that any laborer or mechanic employed on the public work covered by the contract has been or is being paid a rate of wages less than the prevailing rate of wages as aforesaid, the government may by written notice to the contractor terminate his right to proceed with the work. Thus, under the statute and the executive order, the laborer and mechanic is afforded ample and complete protection in the matter of wages to which he may be entitled." (p. 401.)

In January, 1944, the supreme court of Tennessee had occasion to consider the question again in the case of *Harris v. Owen,* 180 Tenn. 492, 176 S. W. 2d 812. The provisions of the contract involved in the cited case were practically identical with those in the present case. From the opinion the following is quoted:

"It is apparent, therefore, that for some unexplained reason, complainants have conceived the idea that they were improperly classified and did not receive the wages to which they were entitled. On the other hand, Owen, in denying liability, is evidently of the opinion that complainants were paid in accordance with the published wage scales. Thus a controversy has arisen which, under the federal statutes, should be submitted to the Secretary of

Labor, since jurisdiction to determine such controversies has not been conferred upon the chancery court of this State. [Citing cases.]

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"So that, after all, this is simply a controversy between employer and employees as to whether the latter have been compensated in accordance with the wage scales prescribed by the Government, and the forum for determining such controversies is the Secretary of Labor." (pp. 495, 496.)

In the case of *Northern States Contracting Co. v. Swope, Judge,* 271 Ky. 140, 111 S. W. 2d 610, the Court of Appeals of Kentucky held as follows:

"It is not necessary to go out of our own jurisdiction for authority for the general proposition that one who sues on a contract made for his benefit must accept the contract as made. [Citing cases.] One may not select the desirable morsels served by his contract and toss the less choice parts beneath the table.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The Act of Congress of March 3, 1931, 46 Stat. 1494, before amendment of August 30, 1935, 40 U. S. C. A. § 276a, relating to contracts which required or involved the employment of laborers in the construction, alteration, or repair of government buildings, was in substance and effect the same as the federal statute under consideration here. The act provided that every such contract should contain certain conditions concerning the rates of wages to be paid as established by the Secretary of Labor, and a further condition that in case any dispute arose as to the applicable rate, which could not be adjusted by the contracting officer, the matter should be referred to the Secretary of Labor for determination, and his decision thereon should be conclusive upon all parties to the contract. It was held without exception, so far as we are advised, that the right being given and the remedy prescribed by statute, that exclusive remedy must be pursued in the forum so fixed, and that the courts were without authority to pass upon those disputes. United States for Use of Wylie v. W. S. Barstow & Co., 4 Cir., 79 F. 2d 496; [and other cases herein cited.]

"The conclusion is that by mandatory operation of the federal statutes and the regulations (statutory in character) under which the plaintiffs brought themselves by their voluntary agreement in accepting employment under the terms of the contracts, the Fayette circuit court is without jurisdiction to hear or determine their various causes of action. The demurrer to Judge Swope's response and the objections to the intervening petitions of the plaintiffs are sustained." (pp. 147, 150.)

The Circuit Court of Appeals for the Fifth Circuit in the case of *Gillioz v. Webb,* 99 F. 2d 585, considered, among other things, the constitutionality of such provisions but such a question is not raised or passed upon in the present case. From the opinion the following is quoted:

"On its face the constitutional point is without merit, for what is in question

here is not the construction or validity of a statute, but of a contract voluntarily entered into with the Government. The fact that Congress authorized, indeed, required the inclusion in it of the clause in question as a condition to letting the work, is significant only upon the question of the authority of the executive officer to write the clause in. Without such authorization, it may well be doubted that the contracting officer of the Government would have had authority to insert it. Cf. United States for Use and Benefit of *Johnson v. Morley Construction Co.,* D. C., 17 F. Supp., 378, 388.

"Plainly and specifically authorized by, indeed, taken from the statute, there can be no doubt of the validity and binding force of this provision of the contract, or that, written in as a part of the public policy of the United States, to insure the payment of adequate wages on public work, its provisions should be liberally construed to effectuate its purpose. [Citing cases.] That purpose was to require the payment of not less than the prevailing rate of wages, and to establish the Secretary of Labor as the appraiser and determiner of that rate, whose finding is a condition precedent to complaints by laborers that the contractor had not paid, and conclusive upon both contractor and laborers as to what was the prevailing rate of wages the contract required to be paid. [citing cases.]" (p. 586.)

In the contract under consideration reference is made to the application of the federal statutes. Even in the absence of such acts, the contract itself clearly provides that the secretary of labor has jurisdiction of the issues involved in this case and under the decisions construing federal acts and similar contracts the determination by the Secretary of Labor is held necessary, final and binding upon all parties. The fact that some of the statutes considered in certain of the cited cases have been repealed, modified or amended does not change the result because the contract provisions prevail regardless of statutes. Counsel for appellee rely upon the case of *Fata v. Healy Co.,* decided by the Court of Appeals of New York in January, 1943, 289 N. Y. 401, 48 N. E. 2d 339. The cited case does not involve construction of the same or similar provisions as are under consideration in the present case. It construes certain statutes of the state of New York and insofar as the opinion discloses the contract considered in the cited case did not contain any provisions relating to the classification of laborers and the settlement of wage disputes by any designated authority. Our search has failed to disclose a case in which it has been held that the contract involved in the present case, or one similar to it, permits the controversy presented here to be passed upon by the state courts. We are aware of the possible modification of *Harris v. Owen,* supra, as disclosed by *Harris v. Owen,* 180 Tenn. 492, 180 S. W. 2d 227. However, as above pointed out, we are not construing statutes in the present case

but enforceable provisions of the contract which have not been declared void by decisions or by legislative enactments. Consequently while such contract provisions are valid and binding, the state courts cannot disregard them and in contravention of the terms of the contract, assume jurisdiction of the contemplated controversies without in effect vitiating valid contractual provisions. Perhaps the question of jurisdiction was not argued fully to the district court but such court did not have jurisdiction and therefore its judgment cannot be affirmed.

The judgment of the district court is reversed with instructions to dismiss the case.